UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMANDA A. JONES, individually,
and as Representative of a Class
of Participants and Beneficiaries
of the Sparrow Health System
Associate Retirement Savings Plan,

       Plaintiff,

       v.

SPARROW HEALTH SYSTEM

       and

BOARD OF DIRECTORS OF
SPARROW HEALTH SYSTEM

       Defendants

Case No: 1:22-cv-1046

CLASS ACTION
COMPLAINT FOR CLAIMS
UNDER 29 U.S.C. § 1132(a)(2)

COMES NOW Plaintiff, Amanda A. Jones, individually and as representative of a Class of Participants and Beneficiaries of the Sparrow Health System Associate Retirement Savings Plan (the "Plan" or "Sparrow Plan"), by her counsel, WAL-CHESKE & LUZI, LLC and HANEY LAW FIRM, P.C., as and for a claim against Defendants, alleges and asserts to the best of her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1.      Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

2.      The ERISA fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982).

3.      The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments [and service providers] and remove imprudent ones." *Id.* (*citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015).)

4.      Even in a defined contribution plan in which participants are responsible for selecting their plan investments, *see* ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct their own independent evaluation to determine which investments [and service providers] may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S. at 529–530) "If the fiduciaries fail to remove an imprudent investment [or service provider] from the plan within a reasonable time," fiduciaries "breach their duty [of

prudence].” *Id.*   Imprudent investments, as that term is used herein and by the United States Supreme Court, includes services provided by Plan recordkeepers. *See id.*

5.     Defendants, Sparrow Health Systems (“Sparrow”), and the Board of Directors of Sparrow Health Systems (collectively, “Defendants”), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as Sparrow Health System Associate Retirement Savings Plan (the “Plan” or “Sparrow Plan”) – that it sponsors and provides to its employees.

6.     During the putative Class Period (November 9, 2016 through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to “pay[ ] excessive recordkeeping fees,” *Hughes*,142 S. Ct. at 739-740, and by failing to timely remove their high-cost recordkeeper, Transamerica Retirement Solutions (“Transamerica”).

7.     These objectively unreasonable recordkeeping and administration (“RKA”) fees cannot be contextually justified and do not fall within “the range of reasonable judgments a fiduciary may make based on her experience and expertise.” *See Hughes*, 142 S. Ct. at 742.

8.     Defendants breached their fiduciary duty of prudence by causing the Plan participants to pay excessive fees for recordkeeping and administration (“RKA”

services. Defendants unreasonably failed to leverage the size of the Plan to pay rea-
sonable fees for Plan RKA fees services.

9.      ERISA's duty of prudence applies to the conduct of the plan fiduciaries
in negotiating RKA fees based on what is reasonable (not the *cheapest* or *average*) in
the applicable market.

10.     There is no requirement to allege the actual inappropriate fiduciary ac-
tions taken because "a breach of fiduciary duty claim under ERISA can survive a mo-
tion to dismiss without 'well-pleaded factual allegations relating directly to the meth-
ods. employed by the ERISA fiduciary if the complaint alleges facts that, if proved,
would show that an adequate investigation would have revealed to a reasonable fidu-
ciary that the investment [or service provider] at issue was improvident." *Comau LLC
v. Blue Cross Blue Shield of Michigan*, 2020 WL 7024683, at *7 (E.D. Mich. Nov. 30,
2020) (quoting *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret.
Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013)).

11.     Courts "decline to add a pre-pleading requirement that plaintiffs ask
nicely for information they need—but cannot compel access to—before filing their
complaint." *Allen v. GreatBanc Tr. Co.,* 835 F.3d 670, 677 (7th Cir. 2016).

12.     The unreasonable RKA fees paid inferentially tells the plausible story
that Defendants breached their fiduciary duty of prudence under ERISA.

13.     These breaches of fiduciary duty caused Plaintiff and Class Members
millions of dollars of harm in the form of lower retirement account balances than they

otherwise should have had in the absence of these unreasonable Plan fees and ex-
penses.

14.     To remedy these fiduciary breaches, Plaintiff brings this action on behalf
of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29
U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches of
the duty of prudence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction in this ERISA matter under
28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal
jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

16.     This Court has personal jurisdiction over Defendants because they
transact business in this District, reside in this District, and have significant contacts
with this District, and because ERISA provides for nationwide service of process.

17.     Venue is appropriate in this District within the meaning of 29 U.S.C.
§1132(e)(2) because some or all of the violations of ERISA occurred in this District
and Defendants reside and may be found in this District.

18.     In conformity with 29 U.S.C. § 1132(h), Plaintiff served the Complaint
on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

19.     Plaintiff, Amanda A. Jones, is a resident of the State of Michigan and
currently resides in Charlotte, Michigan, and during the Class Period, was a partici-
pant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

20.    Plaintiff commenced her employment as a Pharmacy Technician with Sparrow at different locations from December 23, 2000 until May of 2014. In April 2017, Plaintiff began working at Hayes Green Beach Memorial Hospital in Charlotte, Michigan as an Inpatient Pharmacy Technician. Hayes Green Beach was then merged into Sparrow Eaton Hospital in 2019 and Plaintiff remains employed there presently.

21.    Plaintiff is a participant in the Plan and paid excessive RKA fees during the Class Period. During her participation in the Plan, Plaintiff held investments in the T. Rowe Price Retirement 2040 target date fund, Dodge & Cox Stock Fund, and Harbor Capital Appreciation Fund.

22.    Plaintiff has Article III standing as both a current Plan participant to bring this action on behalf of the Plan because she suffered an actual injury to her own Plan account through paying excessive RKA fees during the Class Period, that injury is fairly traceable to Defendants' unlawful conduct in maintaining Transamerica as its recordkeeper, and the harm is likely to be redressed by a favorable judgment providing equitable relief to the Plaintiff and Class.

23.    Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond her own injury.

24.    The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive RKA fees) necessary

to understand that Defendants breached their fiduciary duty of prudence until shortly before this suit was filed.

25.     Having never managed a mega 401(k) Plan, meaning a plan with over $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022) ("Mega plans have more than $500 million in assets,") Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

26.     Sparrow Health System ("Sparrow") is a community-owned, community-governed health system in the Lansing, Michigan area. Sparrow has more than 115 sites of care throughout Mid-Michigan, employs 478 primary care providers and specialists, and employs over 10,000 workers. Sparrow's headquarters are located at 1200 East Michigan, Lansing, MI 48912. In this Complaint, "Sparrow" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

27.     Sparrow acted through its officers, including its Board of Directors, to perform Plan-related fiduciary functions in the course and scope of their business. Sparrow and its Board appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Sparrow and its Board are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

28.     Sparrow is both the Plan Sponsor and Plan Administrator. As the Plan Administrator, Sparrow is the fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). Sparrow has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities and is the named fiduciary of the Plan.

29.     The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that Sparrow's contributions to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

30.     In 2020, the Plan had about $553,700,885 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had substantial bargaining power regarding Plan fees and expenses. Defendants, however, did not regularly monitor Transamerica to ensure that it remained the prudent and objectively reasonable choice.

31.     With 9,953 participants in 2020, the Plan had more participants than 99.81% of the defined contribution plans in the United States that filed 5500 forms for the 2020 Plan year. Similarly, with $553,700,885 in assets in 2020, the Plan had more assets than 99.66% of the defined contribution plans in the United States that filed 5500 forms for the 2020 Plan year.

## ERISA'S FIDUCIARY STANDARDS IN THE
## DEFINED CONTRIBUTION INDUSTRY

32.    Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. An employer may also make matching contribution based on an employee's elective deferrals.

33.    Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

34.    Although Sparrow contributed significant amounts in employer matching contributions to Plan participants during the Class Period, these matching contributions are irrelevant to whether a Plan has paid excessive plan recordkeeping fees or other types of Plan expenses.

35.    While contributions to a plan account and the earnings on investments will increase retirement income, fees and expenses paid by the plan may substantially reduce retirement income. Fees and expenses are a significant factor that affect plan participant's investment returns and impact their retirement income.

36.    According to the United States Department of Labor, Employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided; and (3) monitor investment options and service providers once selected to make sure they continue to be appropriate

choices. *See* United States Department of Labor, Employee Benefit Security Admin-
istration,                 *Meeting*         *Your*         *Fiduciary*         *Responsibilities*,         12         at
https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-cen-
ter/publications/meeting-your-fiduciary-responsibilities.pdf  (last  visited  Aug.  11,
2022) (hereinafter "DOL Fiduciary Publication") ("If you are hiring third-party ser-
vice providers, have you looked at a number of providers, given each potential pro-
vider the same information, and considered whether the fees are reasonable for the
services provided?").

Recordkeeping and Administration ("RKA") Services

37.    Defined contribution plan fiduciaries of mega 401(k) plans hire service
providers to deliver a retirement plan benefit to their employees. There is a group of
national retirement plan services providers commonly and generically referred to as
"recordkeepers," that have developed bundled service offerings that can meet all the
needs of mega retirement plans with a prudent and materially identical level and
caliber of services. Transamerica is one such recordkeeper.

38.    These recordkeepers deliver all the essential recordkeeping and related
administrative ("RKA") services through standard bundled offerings of the materially
identical level and quality as other recordkeepers who service mega plans.

39.    The fees charged by recordkeepers for RKA services are impacted by 1)
the costs of providing the RKA services; 2) the competitive environment related to
what other recordkeepers would charge to provide materially identical services; and
3) the revenues that a recordkeeper can generate from both the recordkeeping fees as

well as other ancillary revenue based on the potential to manage proprietary invest-

ment options in the plan.

40.     Providing RKA services involves both fixed and variable costs.  The more

participants in a plan, the greater proportion of the costs are variable costs which, in

turn, means the closer the average cost per participant approaches the variable cost

per participant.

41.     All else being equal, the more participants a plan has, a recordkeeper

will be able to provide a lower fee per participant to provide identical RKA services

to maintain the same profit margin rate.

42.     As a result, it is axiomatic in the retirement plan services industry that,

all else being equal, the more participants in a plan, the lower the effective RKA fee

per participant the plan can negotiate. All prudent plan fiduciaries and their consult-

ants and advisors are aware of this industry dynamic.

43.     There are two types of essential RKA services provided by all record-

keepers. The first type, "Bundled RKA" services, include:

a.     Recordkeeping;

b.     Transaction Processing (which includes the technology to process pur-
        chases and sales of participants' assets as well as providing the partici-
        pants the access to investment options selected by the plan sponsor);

c.     Administrative Services related to converting a plan from one record-
        keeper to another recordkeeper;

d.     Participant communications (including employee meetings, call cen-
        ters/phone support, voice response systems, web account access, and the
        preparation of other communications to participants, e.g., Summary
        Plan descriptions and other participant materials);

  e.  Maintenance of an employer stock fund;

  f.  Plan Document Services which include updates to standard plan docu-
ments to ensure compliance with new regulatory and legal require-
ments;

  g.  Plan consulting services including assistance in selecting the invest-
ments offered to participants;

  h.  Accounting and audit services including the preparation of annual re-
ports, e.g., Form 5500;

  i.  Compliance support which would include, e.g., assistance interpreting
plan provisions and ensuring the operation of the plan follows legal re-
quirements and the provisions of the plan (including legal services);

  j.  Compliance testing to ensure the plan complies with Internal Revenue
nondiscrimination rules; and

  k.  Trustee / custodian services.

44. The second type of essential RKA services, hereafter referred to as "A
La Carte services," provided by all recordkeepers, often have separate, additional fees
based on the conduct of individual participants and the usage of the service by indi-
vidual participants (usage fees). These "A La Carte RKA" services typically include
the following:

  a.  Loan processing;

  b.  Brokerage services/account maintenance;

  c.  Distribution services; and

  d.  Processing of Qualified Domestic Relations Orders (QDROs).

45.    The sum of the total Bundled RKA fees plus the total A La Carte RKA fees equals the Total RKA fees.

46.    As the retirement plan services industry evolved over the past forty-plus years, the recordkeepers have developed automated or semi-automated processes for providing the RKA services.

47.    In practice, there are no material difference between the services that are offered and provided by national recordkeepers.  Rather, some recordkeepers may differ in *how* they deliver the services.

48.    Indeed, according to the August 27, 2022 Annual Plan Participant Fee Disclosure, a standard package of RKA services were provided to the Plan including "ongoing plan administrative services (e.g., legal, accounting, auditing and record-keeping."  Moreover, "[w]hen applicable, general administrative fees other than the charge above for administrative services (e.g., legal, accounting and auditing), may from time to time be deducted on a pro rata basis across some or all investment options held in [Plan participant's] account."

49.    Because the RKA offering are materially identical among all recordkeepers who provide services to mega plans, like the Sparrow plan, it is the standard and prevailing practice for retirement plan consultants and advisors (experts in the retirement plan industry) to request quotes by asking what the recordkeeper's revenue requirement is on a per participant basis for providing the Bundled RKA services.

50.    Similarly, in most cases differences in fee rates for the A La Carte services are immaterial in determining the total fees charged by recordkeepers.

51.     The same is true for the Bundled RKA fee rates charged by recordkeepers. Retirement plan consultant and advisors primarily use the Bundled RKA fee rate of different recordkeepers to make fee rate comparisons and determine whether the Bundled RKA fee rate is reasonable.

52.     This approach is validated by the structure of the request for proposals ("RFPs") sent out by retirement plan consultants and advisors and the responses provided by the recordkeepers and then the summary of the evaluations created by the retirement plan consultants and advisors.

53.     For mega plans, like the Sparrow Plan, any immaterial variations in the way certain services are received by one plan compared to another plan have an immaterial impact on the reasonable market rate for Bundled RKA services.

54.     As a result, comparisons of the fees paid by similar sized plans are meaningful and provide a reasonable basis for determining whether an inference of imprudence is warranted based on the RKA fees being paid by any specific plan.

55.     Since well before 2015, industry experts have maintained that for mega retirement plans like the Sparrow Plan, prudent fiduciaries treat Bundled RKA services as a commodity with little variation in price. "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Pro-*

*viders: Separating Commodity from Value-Added Services*, https://www.employeefi-duciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-ser-vices (Feb. 10, 2015).

56.     Industry experts know that recordkeeping services have become a com-modity for retirement plan fiduciaries; virtually every major recordkeeper provide the same core services. See, e.g., Allen Steinberg, *Unchecked Revenue: Show Me the Fees*, https://blog.retireaware.com/2018/01/12/unchecked-revenue/ (last visited Sep. 15, 2022); Fred Barstein, Investment News, *Potential Pru Retirement Sale a Cautionary Tale of a 401(k) Innovator*, https://www.investmentnews.com/prudential-retirement-sale-cautionary-tale-innovatio-205453 (Apr. 20, 2021) ("It is no wonder, but certainly disappointing, that one of the industry's most innovative providers, Prudential Retire-ment, is reportedly exploring a sale. That highlights how much record keeping has be-come a commodity focused on scale and costs.").

57.     Fidelity, the largest 401k recordkeeper in the country, has conceded that the RKA services that it provides to mega Plans are commodified, including to its own Plan for its own employees.

58.     As part of stipulated facts in another case, it stated: "The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per partic-ipant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year, and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per par-ticipant, per year. *Had the Plan been a third-party plan that negotiated a fixed fee*

*for recordkeeping services at arm's length with Fidelity it could have obtained record-keeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present)."* See *Moitoso v. FMR LLC, et al.*, 1:18-CV-12122-WGY, Stipulation of Facts, Dkt. 128-67, at 4-5 (D. Mass. Sep. 6, 2019) (emphasis added).

59.    All recordkeepers quote fees for the Bundled RKA services on a per participant basis without regard for any individual differences in services requested, which are treated by the recordkeepers as immaterial because they are inconsequential from a cost perspective to the delivery of the Bundled RKA services.

60.    Because dozens of recordkeepers can provide the complete suite of required RKA services, plan fiduciaries can ensure that the services offered by each specific recordkeeper are apples-to-apples comparisons.

61.    There is nothing disclosed in the Participant section 404(a)(5) fee and service disclosure documents that suggests that the annual administrative fee charged to participants included any services that were unusual or above and beyond the standard recordkeeping and administrative services provided by all national recordkeepers to mega plans with more than $500,000,000 in assets.

62.    By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing RKA has stabilized, and has not materially changed for mega plans, including the Sparrow Plan. Reasonable

recordkeeping fees paid in 2018 are representative of the reasonable fees during the entire Class Period. *See The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2020*, ICI Research Perspective, at 4 (June 2021).

63.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

64.     Recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."  The Sparrow Plan paid Transamerica both direct and indirect compensation.

65.     The amount of direct and indirect compensation paid to recordkeepers like Transamerica must be *reasonable* (not the cheapest or the average in the market).

66.     Reasonable, in turn, depends on contextually understanding the market for such recordkeeping services at the time that the recordkeeping contract is entered into. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

## THE PLAN

67.     During the entire Class Period, the Plan received recordkeeping services from Transamerica.

68.     At all relevant times, the Plan's recordkeeping fees were objectively unreasonable and excessive when compared with the fees paid by other comparable 401(k) plans that had similar numbers of plan participants.

69.     The fees were also excessive relative to the level and quality of record-keeping services received since the same level and quality of services are provided to all mega plans, like the Sparrow Plan, any minor variation with respect to the use of components of the standard offering 1) do not impact the Bundled RKA fee rates; and 2) are virtually always immaterial as it relates to the Total RKA fee rates and cannot reasonable explain the disparity between what the Plan paid and the market rate for the services received.

70.     This is true regardless of the specific service codes listed by the plan on the Form 5500.  *See* Droblyen, *supra*; Steinberg, *supra*; Barstein, *supra*.

71.     These excessive Plan recordkeeping fees led to lower net returns than the rates enjoyed by participants in comparable 401(k) plans.

72.     During the Class Period, Defendants breached their duty of prudence to the Plan, to Plaintiff, and all other Plan participants, by authorizing the Plan to pay objectively unreasonable fees for recordkeeping services.

73.     Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan participants and their beneficiaries, breached their fiduciary duties of prudence in violation of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiff and members of the Class millions of dollars of harm to their Plan accounts.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING RECORDKEEPERS

74.     Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same

level and quality of services currently being provided to the Plan. *See, e.g.,* U.S. DE-PARTMENT OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 6, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf  (last  visited Oct. 10, 2022) ("Once you have a clear idea of your requirements, you are ready to begin receiving estimates from prospective providers. Give all of them complete and identical information about your plan and the features you want so that you can make a meaningful comparison. This information should include the number of plan participants and the amount of plan assets as of a specified date.")

75.    Prudent plan fiduciaries can easily receive a quote from other record-keepers to determine if their current level of recordkeeping fees is reasonable in light of the level and quality of recordkeeper fees. It is not a cumbersome or expensive process.

76.    It is the standard of care prevailing among industry experts to solicit competitive bids every three to five years. *See* CAPTRUST, *Understanding and Evaluating Retirement Plan Fees / Part One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-approach/ (stating "best practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years. Recordkeeping and administrative fees should be evaluated and compared to plans of similar size and type that are receiving analogous services. While each plan is unique—making an apples-to-apples comparison imperfect—evaluating fees against similarly situated

and sized plans provides a good reference point in helping to determine if plan fees are reasonable.").

77.    Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and qualities of services for a more competitive reasonable fee if necessary.

78.    A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated recordkeeping fees. To receive a truly "reasonable" recordkeeping fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

79.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

80.    First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

81.    Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

82.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

83.     Accordingly, the only way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of recordkeeping services is to obtain competitive bids from other providers in the market.

### THE PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR RECORDKEEPING FEES AND THE PLAN THUS PAID UNREASONABLE RECORDKEEPING FEES

84.     A plan fiduciary must continuously monitor its RKA fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

85.     During the Class Period, Defendants failed to regularly monitor the Plan's Bundled RK&A fees paid to recordkeepers, including but not limited to Transamerica.

86.     During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Transamerica, in order to avoid paying unreasonable Bundled RK&A fees.

87.     During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively un-reasonable RKA fees it paid to Transamerica and in light of the level and quality of recordkeeper services it received.

88.     From the years 2016 through 2020, the table below shows the actual year-end recordkeeping fees illustrating that the Plan had on average had 8,841 par-ticipants and paid an average effective total fee for all recordkeeping and adminis-trative services ("Total RKA") of at least approximately $744,774, which equates to an average of at least approximately $81 per participant.  These amounts are calcu-lated by the Plan's Form 5500 filings and indicate the total RKA fees (the sum of the Bundled RKA fees and the A La Carte RKA fees).[1]

## Total Recordkeeping and Administration (Total RKA) Fees

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | *Average* |
|---|---|---|---|---|---|---|---|
| **Participants** | 7,863 | 8,199 | 8,782 | 9,410 | 9,953 | 10,954 | *9,194* |
| **Est. Total RKA Fees** | $678,823 | $832,286 | $729,694 | $663,433 | $708,319 | $856,089 | *$744,774* |
| **Est. Total RKA Per Par-ticipant** | $86 | $102 | $83 | $71 | $71 | $78 | *$81* |

97.     The fees paid by the comparable plans in the table below are also derived from publicly available information reported in 5500 forms and the accompanying financial statements that are required to be filed with the Department of Labor each year using the exact same methodology used to calculate the fees paid by the Plan

---

[1] "Est. RKA Fees" on the above chart are taken directly from the audited Financial State-ments attached to the Sparrow Health System Associate Retirement Savings Plan Form 5500s.  The amounts are recorded as "Administrative service fees" on the Statements of Changes in Net Assets Available for Benefits which are audited by AHP, an independent registered public accounting firm.

above. An analysis of these documents allows for a determination of *the direct and indirect compensation* received by recordkeepers.

98.     More specifically, the methodology for computing these figures include the following: (1) take the direct compensation paid to each plan's Recordkeeper(s) directly from Schedule C of Form 5500; (2) review the investments held by the plan listed in the supplemental schedule to Form 5500, Schedule H, Part IV, Line 4(i) – Schedule of Assets; (3) review Schedule C, Part I, Line 3 for revenue sharing earned by investments in the plan; (4) cross-reference publicly available revenue sharing rates for investment options by recordkeeping platform and custody and trading partners to determine whether each investment option contains any revenue sharing and, if so, what the appropriate revenue sharing rate is for each investment option in the plan; (5) use the year-end assets for each investment option from Form 5500, Schedule H, Part IV, Line 4(i) and multiply it by the appropriate revenue sharing rate to determine the amount of indirect compensation earned by the recordkeeper; (6) review the notes of the Audited Financial Statement attachment to Form 5500; (7) add the direct and indirect compensation together to arrive at the Unadjusted Total RKA Fee/pp; and (8) subtract any indirect compensation (revenue sharing) returned to the Plan in the form of pricing credits, etc. to arrive at the Total RKA Fee/pp.

**Comparable Plans' RKA Fees Based on Publicly Available Information from Form 5500**
(Price Calculations are based on 2018 Form 5500 information)

| Plan | Partici-pants | Assets | Total RKA Fee | Total RKA Fee /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Flowserve Corporation Retirement Savings Plan | 6,395 | $892,435,613 | $263,380 | $41 | T. Rowe Price | White |
| The Boston Consulting Group, Inc. Employees' Savings Plan and Profit Sharing Retirement Fund | 8,067 | $894,454,060 | $336,660 | $42 | Vanguard | White |
| Bausch Health Compa-nies Inc. Retirement Savings Plan | 8,902 | $904,717,349 | $322,496 | $36 | Fidelity | White |
| **Sparrow Plan Average Fee** | **9,194** | **$406,490,038** | **$744,774** | **$81** | **Transamerica** | **Red** |
| Children's Medical Center of Dallas Em-ployee Savings Plan 403(B) | 9,356 | $349,335,673 | $337,416 | $36 | Fidelity | White |
| Ralph Lauren Corpora-tion 401(K) Plan | 9,389 | $552,586,935 | $290,066 | $31 | T. Rowe Price | White |
| Vibra Healthcare Re-tirement Plan | 9,750 | $107,652,510 | $277,532 | $28 | Great-West | White |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $324,171 | $33 | Great-West | White |
| Southern California Permanente Medical Group Tax Savings Re-tirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard | White |
| Viacom 401(K) Plan | 12,196 | $1,249,874,734 | $376,314 | $31 | Great-West | White |
| Sutter Health Retire-ment Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity | White |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity | White |

89.    From the years 2016 through 2021, the graph below illustrates the an-

nual Total RKA fees paid by other comparable plans (set forth in the table above)

with a similar number of participants and a similar amount of plan assets receiving at least the same level and quality of services for less, compared to the average annual retirement plan service fees paid by the Plan (as identified in the table above), with the white data points representing retirement plan service fees that recordkeepers offered to (and were accepted by) comparable plans.



90.     The trend line (dashed white in the graph above) generated from these data points represent a very reasonable estimate of the fee rate that several recordkeepers serving the mega market would be willing to accept in a competitive environment to provide Total RKA services to the Plan.

91.     Comparing the Bundled RKA fees of the Sparrow Plan with the Total RKA fees (Bundled + A La Carte) of the comparator plans means that the chart above significantly underestimates the excessive RKA fees paid by the Sparrow Plan to Transamerica during the Class Period.

92.     As noted above, the more participants a plan has, the lower the effective fee per participant that recordkeepers are willing to provide. The trend line in the graph represents a per participant fee rate for a given number of participants around which a plan fiduciary would expect to receive initial bids for the Bundled RKA services.

93.     The fact that the amount paid by the Sparrow Plan to Transamerica for RKA services *increased* during the Class Period, while the number of participants *increased*, is yet another indicia of the imprudence of Defendants' fiduciary process in continuing to contract with Transamerica throughout the Class Period.

94.     When a plan fiduciary follows prudent practices as outlined by the Department of Labor ("DOL") and solicits bids from several recordkeepers in a competitive environment, some initial bids for the Bundled RKA services would be below the trend line and others would be above the trend line. Ultimately, a prudent plan fiduciary should be able to negotiate a Bundled RKA fee lower than the trend line such that the total RKA fee would be proximate to the trend line

95.     The RKA fees calculated for each similar comparable plan in the table above include all the direct compensation paid to the recordkeeper disclosed on each plan's Form 5500, as well as all indirect compensation. Specifically, if the plan's pricing structure as described in each plan's Form 5500 reveals that some or all of the revenue sharing is not returned to the plan, then the appropriate amount of revenue sharing is also included to calculate the RKA fees. In some cases, the plan's investment options do not contain revenue sharing and, as a result, any indirect revenue is

immaterial to the RKA fees. In other plans, all of the revenue sharing is returned to the plans and is therefore not included in the fee calculation.

96.     The comparable plans above received at least the same RKA services received by the Plan for the fees paid. In other words, the fees in the table above are apples-to-apples comparisons in that they include all the fees being charged by each recordkeeper to provide the same RKA services to similar defined contribution plans.

97.     As the table above indicates, the fees paid by the Plan for virtually the same package of services are much higher than those of plans with comparable, and in many cases smaller, participant counts. Based on fees paid by other large plans during the Class Period receiving materially identical RKA services, it is clear and more than reasonable to infer that Defendants failed to follow a prudent process to ensure that the Plan was paying only reasonable fees.

98.     In light of the amounts remitted to Transamerica throughout the Class Period, Defendants clearly engaged in virtually no examination, comparison, or benchmarking of the RK&A fees of the Plan to those of other similarly sized defined contribution plans or were complicit in paying grossly excessive fees.

99.     Defendants' failure to recognize that the Plan and its participants were grossly overcharged for RKA services and their failure to take effective remedial actions amounts to a breach of their fiduciary duties to the Plan

100.    Any alleged minor differences in service levels or quality cannot explain the disparity of $46 per participant (a more than 131% premium), compared to the Total RKA fees paid by other comparable plans with similar amounts of participants.

101.    From the years 2016 to 2021 and based upon information informed by 404(a)(5) participant fee disclosures and derived from the 5500 forms and the accompanying financial statements, the table and graph above illustrates that the Plan paid an effective average annual recordkeeping fee of $81 per participant.

102.    From the years 2016 through 2021 and based upon information informed by 404(a)(5) participant fee disclosures and derived from the 5500 forms and the accompanying financial statements, the table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual recordkeeping fee of around $35 per participant, if not lower.

103.    From the years 2016 through 2021, and based upon information informed by 404(a)(5) participant fee disclosures and derived from the 5500 forms and the accompanying financial statements, and as also compared to other Plans of similar sizes with similar level and quality of services, had Defendants been acting prudently, the Plan actually would have paid significantly less than an average of approximately $744,774 per year in recordkeeping fees, which equated to an effective average of approximately $81 per participant per year.

104.    From the years 2016 through 2021, and based upon information informed by 404(a)(5) participant fee disclosures and derived from the 5500 forms and the accompanying financial statements, and as also compared to other Plans of similar sizes and with similar level and quality of services, had Defendants been acting prudently, the Plan actually would have paid on average a reasonable effective annual market rate for recordkeeping of approximately $321,773 per year, which

equates to approximately $35 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan Fiduciary would not agree to pay *more than double* what they could otherwise pay for materially the same level and quality of recordkeeping.

105.   From the years 2016 through 2021 and based upon information informed by 404(a)(5) participant fee disclosures and derived from the 5500 forms and the accompanying financial statements, the Plan additionally cost its participants on average approximately $423,002 per year in additional recordkeeping fees, which equates to on average approximately $46 per participant per year.

106.   From the years 2016 to 2021, and because Defendants did not act with prudence, and as compared to other Plans of similar sizes and with similar level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $2,538,009 in unreasonable and excessive RKA fees.

107.   From the years 2016 to 2021, based upon information informed by 404(a)(5) participant fee disclosures and derived from the 5500 forms and the accompanying financial statements, because Defendants did not act prudently, and as compared to other Plans of similar sizes and with similar level and quality of services, the Plan actually cost its Participants (when accounting for compounding percentages) a total, cumulative amount in excess of $4,277,190 in RKA fees.

108.   Defendants could have offered the exact same RKA services at a lower cost by prudently negotiating with its current recordkeeper or by using a different recordkeeper but did not do so.

109.   Defendants could have received RKA services during the Class Period of the same level and quality from Transamerica or other recordkeepers that provide recordkeeping services to mega plan, like the Sparrow plan, because both the Plan 5500 forms and Plan fee disclosures to participants establish that the Plan received no services that were materially different than the services received by all the comparable plans in the chart above. There is no evidence, based on these Plan documents and participant fee disclosures that the plan received any additional services or a higher level or quality of services that would warrant a higher fee.

110.   Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, these recordkeeping allegations are not about reasonable tradeoffs between recordkeepers providing a different level or quality of services.

111.   Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing recordkeeper, Transamerica, and Defendants could have obtained the same RK&A services for less.

112.   Plaintiffs paid these excessive RK&A fees in the form of direct and indirect compensation to the Plan and suffered injuries to his Plan account as a result of paying these excessive fees.

113.    Plaintiff has participated in several 401(k) plans from a number of employers and there have been no material differences in the Bundled RKA services that she has received.

114.    Plaintiffs do not need to provide examples of similar plans receiving the <u>same</u> services in the <u>same</u> year where the primary drivers of price, as with the Sparrow Plan, are the number of accounts and whether the plan's fiduciaries solicited competitive bids, rather than the marginal cost of recordkeeping for each participant. *See Coyer et al. v. Univar Solutions USA Inc. et al.*, 2022 WL 4534791, at *5 (N.D. Ill. Sept. 28, 2022) (emphasis in original).

115.    "The fact that each of the other similarly-sized plans were receiving <u>at least</u> the same services for less provides the kind of circumstantial evidence sufficient to create an inference of imprudence." *Id.* (citing *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 332 (3d Cir. 2019)) (emphasis in original).

116.    During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's Bundled RKA fees it paid to Transamerica, but Defendants either simply failed to do so, or did so ineffectively given that it *paid more than double* for Bundled RKA fees than it should have.

117.    The Plan Bundled RKA fees were also excessive relative to the RKA services received, since the quality and level of such services are standard for mega 401(k) plans like this Plan and are provided on an "all-you-can-eat-basis," based primarily on the number of participants a plan has.

118.    The market for RKA services for mega plans, like the Sparrow University Plan, is such that all national recordkeepers can provide all the required services that a mega plan might need. Any differences in the quality or scope of the services delivered are immaterial to the difference between what the Plan paid for Bundled RKA services and what the reasonable fair market fee was for substantially identical services.

119.    During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Bundled RKA fees than they should have been and/or by failing to take effective remedial actions including removing Transamerica as the Plan recordkeeper, Defendants breached their fiduciary duty of prudence to Plaintiff and Plan participants.

## CLASS ACTION ALLEGATIONS

120.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

121.    In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Sparrow Health System Associate Retirement Savings Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning November 9, 2016 and running through the date of judgment.

122.    The Class includes close to 10,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

123.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

    a.    Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

    b.    Whether Defendants breached their fiduciary duties to the Plan;

    c.    What are the losses to the Plan resulting from each breach of fiduciary duty; and

    d.    What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

124.    Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a Participant during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

125.    Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he is a Participant in the Plan during the Class period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

126.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

127.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

128.    Plaintiff's attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

129.    The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

130.    The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries

whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

131.    Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

132.    Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

<u>FIRST CLAIM FOR RELIEF</u>
Breach of Duty of Prudence of ERISA, as Amended
<u>(Plaintiff, on behalf of herself and Class, Against Defendants –RKA Fees)</u>

133.    Plaintiff restates the above allegations as if fully set forth herein.

134.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

135.    29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendants in their administration of the Plan.

136.    Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges objectively reasonable RKA fees.

137.   During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's RKA fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

138.   During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's RKA fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

139.   During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper, Transamerica, to make sure it was providing the RKA services at reasonable costs, given the highly competitive market surrounding recordkeeping and the significant bargaining power the Plan had to negotiate the best fees, and remove the recordkeeper if it provided RKA services at objectively unreasonable costs.

140.   During the Class Period, Defendants breached their duty to Plan participants, including Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeepers critically or objectively in comparison to other recordkeeper options.

141.   Through these actions and omissions, Defendants breached their fiduciary duty of prudence with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(B).

142.    Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

143.    As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

144.    Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Sparrow Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief as set forth in the Prayer for Relief.

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
(Plaintiff, on behalf of herself and Class, Against Defendants – RKA Fees)

145.    Plaintiff restates the above allegations as if fully set forth herein.

146.    Defendants had the authority to appoint and remove members or individuals responsible for Plan RKA fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

147.   In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan RKA fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

148.   Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

149.   The objectively unreasonable and excessive RKA fees paid by the Plan to Transamerica inferentially suggest that Defendants breached their duty to monitor by, among other things:

a.     Failing to monitor and evaluate the performance of individuals responsible for Plan RKA fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably RKA expenses;

b.     Failing to monitor the process by which the Plan's recordkeeper, Transamerica, was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

c.     Failing to remove individuals responsible for Plan RKA fees whose performance was inadequate in that these individuals continued to pay the

same RKA costs even though solicitation of competitive bids would have shown that maintaining Transamerica as the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

150.   As the consequences of the foregoing breaches of the duty to monitor for RKA fees the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

151.   Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Sparrow Plan all loses caused by their failure to adequately monitor individuals responsible for Plan RKA fees. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.   A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.   Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.   A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.   An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable RKA costs, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligation;

E.    An Order requiring Defendant Sparrow to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Sparrow as necessary to effectuate relief, and to prevent Sparrow's unjust enrichment;

F.    An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.    An award of pre-judgment interest;

I.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.    Such other and further relief as the Court deems equitable and just.

Dated this 9th day of November, 2022

*s/ Paul M. Secunda*
Paul M. Secunda
**WALCHESKE & LUZI, LLC**
235 Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
E-Mail: psecunda@walcheskeluzi.com

Troy W. Haney
**HANEY LAW FIRM, P.C.**
330 E. Fulton
Grand Rapids, MI 49503
Telephone: (616) 235-2300
Fax: (616) 459-0137
E-Mail: thaney@troyhaneylaw.com

*Attorneys for Plaintiff*