UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMANDA A. JONES,                      )
                                      )
                Plaintiff,            )
                                      )
                                      )   Case No. 1:22-cv-01046-PLM-RSK
       v.                             )
                                      )   District Judge Paul L. Maloney
                                      )   Magistrate Judge Ray Kent
SPARROW HEALTH SYSTEM, *et al*.,      )
                                      )   **ORAL ARGUMENT REQUESTED**
                                      )
                Defendants.           )
                                      )
_____ /

**BRIEF IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT
(ORAL ARGUMENT REQUESTED)[1]**

---

[1] While Defendants to not believe oral argument is necessary for the Court's granting of this Motion, Defendants welcome oral argument if the Court finds it would aid the Court in any way in considering this Motion.

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ............................................................................................ii

**INTRODUCTION** ........................................................................................................ 1

**BACKGROUND AND ALLEGATIONS OF THE COMPLAINT** ............................. 3

   **A.** **Plaintiff Incurred No Net Fees To TRS** ............................................................ 7

   **B.** **Specific Services Provided By TRS To The Plan** ............................................. 9

   **C.** **The Eleven "Comparators" Report Very Different, And Usually Much Fewer, Services** ……………………………….…………………………………………12

**ARGUMENT** ............................................................................................................. 13

   **A.** **The Legal Standards** ......................................................................................... 13

   **B.** **Plaintiff Lacks Article III Standing** .............................................................. 16

   **C.** **Plaintiff Fails To State A Claim For Breach of Duty of Prudence Based On Alleged Recordkeeper Fees (Count I)** ……………………………………………………12

     **1.** **Plaintiff Lacks Specific Facts To Support Her Pricing Comparisons** .................. 17

     **2.** **The Presented Plans Vary Widely In Range And Are Not Demonstrably Comparable Or Representative Of One Another** .................................................. 22

     **3.** **Plaintiff Does Not Show Her Alleged Math.** ............................................... 23

     **4.** **The Pleading Standard Is Not  Lowered For Plaintiff** ........................................... 24

   **D.** **Plaintiff Fails To State A Derivative Monitoring Claim (Count II)** ……………….. 25

**CONCLUSION** ........................................................................................................ 26

# TABLE OF AUTHORITIES

## Cases

*Albert v. Oshkosh Corp.*, 47 F.4th 570 (7th Cir. 2022)......................................................... 15, 20

*Barchock v. CVS Health Corp.*, 886 F.3d 43 (1st Cir. 2018)..................................................... 22

*Bassett v. NCAA*, 528 F.3d 426 (6th Cir. 2008) .................................................................... 16

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................ 15, 24

*Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356 (6th Cir. 2001) ............................................ 16

*Burch v. Whirlpool* Corp., No. 17–18, 2017 WL 7370988 (W.D. Mich. Sept. 28, 2017) .............. 16

*Carlsen v. GameStop, Inc.*, 833 F.3d 903 (8th Cir. 2016) ............................................................ 14

*Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014) ............................................................ 14

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S.Ct. 1138, 1148 (2013) .............................. 13

*Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365 (6th Cir. 2011) .......................... 15

*Cunningham v. USI Insurance Services, LLC*, 2022 WL 889164 (S.D.N.Y. Mar. 25, 2022) ...... 23

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*, No. 17–6685, 2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019) ............................................................................................................................ 19

*Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) ...................................................... 15

*Forman v. TriHealth*, 563 F. Supp. 3d 753 (S.D. Ohio 2021).............................................. 18, 19

*Fritton v. Taylor Corp.*, No. 22–415, 2022 WL 17584416 (D. Minn. Dec. 12, 2022)............. 2, 21

*Glick v. ThedaCare, Inc.*, No. 20–1236, 2022 WL 16927749 (E.D. Wis. Oct. 27, 2022).......2, 21

*Gonzalez v. Northwell Health, Inc.*, No. 20–3256, --- F.Supp.3d ----, 2022 WL 4639673 (E.D.N.Y. Sept. 30, 2022)............................................................................................... 2, 21

*Gould Elecs. Inc. v. United States*, 220 F.3d 169 (3d Cir. 2000)............................................... 14

*Hughes v. Northwestern Univ.*, 211 L. Ed. 2d 558, 142 S. Ct. 737 (2022) .................................. 15

*Hyman v. City of Louisville*, 53 F. App'x 740 (6th Cir. 2002) .................................................... 13

*I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759 (2nd Cir. 1991)......................... 16

*In re Huntington Bancshares Inc. Erisa Litig.*, 620 F. Supp. 2d 842 (S.D. Ohio 2009) .............. 26

*Johnson v. Providence Health & Servs.*, No. 17–1779, 2018 WL 1427421 (W.D. Wash. Mar. 22, 2018) ........................................................................................................................... 19

*Kiser v. Reitz*, 765 F.3d 601 (6th Cir. 2014) .................................................................... 13, 16

*Kong v. Trader Joe's Co.*, No. 20–05790, 2020 WL 5814102 (C.D. Cal. Sept. 24, 2020).......... 19

*Kreipke v. Wayne State Univ.*, 807 F.3d 768 (6th Cir. 2015) ...................................................... 15

*Laabs v. Faith Techs., Inc.*, No. 20–1534, 2022 WL 17418358 (E.D. Wis. Nov. 9, 2022) ..... 2, 21

*Lange v. Infinity Healthcare Physicians, S.C.*, No. 20–737, 2021 WL 3022117 (W.D. Wis. July 16, 2021) ......................................................................................................... 2, 17

*Ley v. Visteon Corp.*, 543 F.3d 801 (6th Cir. 2008) ....................................................... 16

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................. 14, 16

*Lyshe v. Levy*, 854 F.3d 855, 857–58 (6th Cir. 2017) ................................................... 13

*Marks v. Trader Joe's*, No. 19–10942, 2020 WL 2504333 (C.D. Cal. Apr. 24, 2020) .............. 24

*Matney v. Barrick Gold of N. Am., Inc.*, No. 20–275, 2022 WL 1186532 (D. Utah Apr. 21, 2022) ................................................................................................................ 21, 26

*Mator v. Wesco Distribution, Inc.*, No. 21–00403, 2022 WL 1046439 (W.D. Pa. Apr. 7, 2022) ....
............................................................................................................................19, 25

*Matousek v. MidAmerican Energy Co.*, 51 F.4th 274 (8th Cir. 2022) ......................... 20

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ........................................ 16

*Mills v. Barnard*, 869 F.3d 473 (6th Cir. 2017) .......................................................... 14

*Morales v. Capital One Fin. Corp.*, No. 21–1454, Dkt. 42 (Order) (E.D. Va. May 27, 2022) .... 21

*New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046 (6th Cir. 2011) ................. 15

*New Eng. Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495 (6th Cir. 2003) ...................................................................................................................... 16

*Nichols v. Muskingum Coll.*, 318 F.3d 674 (6th Cir. 2003) ......................................... 14

*Nohara v. Prevea Clinic Inc.*, No. 20–1079, 2022 WL 16927810 (E.D. Wis. Oct. 27, 2022) . 2, 21

*O'Driscoll v. Plexus Corp.*, No. 20–1065, 2022 WL 3600824 (E.D. Wis. Aug. 23, 2022) ..... 2, 17

*Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320 (6th Cir. 1990) ...................... 14

*Parsons v. United States Dep't of Justice*, 801 F.3d 701, 710 (6th Cir. 2015) ............... 13

*Perkins v. United Surgical Partners Int'l Inc.*, No. 21–973, 2022 WL 824839 (N.D. Tex. Mar. 18, 2022) ............................................................................................................... 21

*Riley v. Olin Corp.*, 21–01328, 2022 WL 2208953 (E.D. MS, June 21, 2022) ............... 20

*Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434 (6th Cir. 1988) ................... 14

*Seidner v. Kimberly-Clark Corp.*, 21–867, 2022 WL 865890 (N.D. Tex. Mar. 23, 2022) ......... 19

*Singh v. Deloitte LLP*, No. 21–8458, 2023 WL 186679 (S.D.N.Y. Jan. 13, 2023) ................ 2, 22

*Smith v. CommonSpirit Health*, 37 F.4th 1160 (6th Cir. 2022) ............................... passim

*Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576 (6th Cir. 2016) ............................ 17

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) .............................................................. 16

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) .................................... 13

*Thole v. U.S. Bank, N.A.*, 140 S. Ct. 1615 (2020) ....................................................... 17

*Tobias v. NVIDIA Corp.*, 20–06081, 2021 WL 4148706 (N.D. Cal. Sept. 13, 2021) ................. 20

*Warth v. Seldin*, 422 U.S. 490, 501 (1975) ................................................................. 13

*Wehner v. Genentech, Inc.*, No. 20–06894, 2021 WL 507599 (N.D. Cal. Feb. 9, 2021) ............. 19

*Weiner v. Klais & Co.*, 108 F.3d 86 (6th Cir. 1997) ................................................... 16

*White v. Chevron Corp.*, 16–0793, 2017 WL 2352137 (N.D. Cal. May 31, 2017) ............... 23, 24

*White v. Chevron Corp.*, No. 16–0793, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ............. 19

*Young v. General Motors Investment Management Group*, 325 F. App'x 31 (2d Cir. 2009) ...... 19

**Statutes**

29 U.S.C. § 1001 ................................................................................................. 10, 16

29 U.S.C. § 1024(b)(4) ............................................................................................ 25

**Other Authorities**

"Frequently Asked Questions About 401(k) Plan Research," Investment Company Institute (Oct. 11, 2021), available at https://www.ici.org/faqs/faq/401k/faqs_401k (last visited January 26, 2023) ................................................................................................. 1

2021 Form 5500 for the Plan, at p. 41 of 52 (Notes to Financial Statements, Dec. 31, 2021), ¶ 1 ("Description of Plan"), available at https://www.efast.dol.gov/5500search/ (last visited January 26, 2023) ................................................................................................. 4

Nathaniel Lee, "How 401(k) accounts killed pensions to become one of the most popular retirement plans for U.S. workers," Retirement, CNBC (Mar. 24, 2021, updated Apr. 28, 2022), *available at* https://www.cnbc.com/2021/03/24/how-401k-brought-about-the-death-of-pensions.html (last visited January 26, 2023) ................................................................. 1

**Rules**

Fed. R. Civ. P. 12(b)(1) ........................................................................................ 13, 14

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 14, 20

**INTRODUCTION**

This case should have never been filed. One in a string of scores of often-mimicked recordkeeping fee cases filed around the nation in the last several years, this one fails to get off the ground, and must be cast aside. As an initial matter, Plaintiff experienced no actual net charges to her 401(k) account from the recordkeeper fee arrangement about which she complains, as any fees that would have affected her were offset and wiped out by the application of credits. As a result, Plaintiff has suffered no injury-in-fact and thus lacks standing to pursue her claims.

Second, armed merely with opinions and a conclusory mishmash of alleged basic data from alleged comparable plans, Plaintiff: (a) nowhere presents her formulae for many of her figures as to other plans; (b) nowhere presents a cogent theory for why Plaintiff chose to present those eleven plans only, and why a sample size of eleven from among 600,000 demonstrates a legal mandate;[2] (c) nowhere presents facts showing why those eleven plans are even comparable in meaningful and necessary ways; (d) presents no facts about the actual services provided by the alleged comparable plans or the Sparrow Plan (and ignores the actual, varying services that are evident even from the Annual Report Form 5500s filed for these plans); and (e) presents merely guesswork and speculative *conclusions* – and no facts – claiming Defendants failed to negotiate, monitor, solicit recordkeepers, order benchmarking, or examine the fees being charged or their reasonableness in light of the services properly sought and provided.

---

[2] *See* "Frequently Asked Questions About 401(k) Plan Research," Investment Company Institute (Oct. 11, 2021), available at https://www.ici.org/faqs/faq/401k/faqs_401k (last visited January 26, 2023) ("In 2020, there were about 600,000 401(k) plans, with about 60 million active participants and millions of former employees and retirees."); *see also* Nathaniel Lee, "How 401(k) accounts killed pensions to become one of the most popular retirement plans for U.S. workers," Retirement, CNBC (Mar. 24, 2021), updated Apr. 28, 2022), *available at* https://www.cnbc.com/2021/03/24/how-401k-brought-about-the-death-of-pensions.html (last visited January 26, 2023) ("In 2020, there were about 600,000 401(k) plans, with approximately 60 million Americans participating in them.").

Even if she clears the lack-of-standing hurdle, which she cannot, Plaintiff is still armed with

mere opinions, guesswork, labels and conclusions; presents faulty and unreliable comparators on

their face; fails to compare apples-to-apples; and makes leaps of logic that cannot survive

dismissal.  This dog won't hunt.[3]  This Complaint should become the next addition to the pile of

---

[3] *See Nohara v. Prevea Clinic Inc.*, No. 20–1079, 2022 WL 16927810, at *5 (E.D. Wis. Oct. 27, 2022), *report and recommendation adopted*, 2022 WL 16924483 (E.D. Wis. Nov. 14, 2022); *Glick v. ThedaCare, Inc.*, No. 20–1236, 2022 WL 16927749, at *7 (E.D. Wis. Oct. 27, 2022), *report and recommendation adopted*, 2022 WL 16924188 (E.D. Wis. Nov. 14, 2022); *Laabs v. Faith Techs., Inc.*, No. 20–1534, 2022 WL 17418358, at *3 (E.D. Wis. Nov. 9, 2022), *report and recommendation adopted*, 2022 WL 17417583 (E.D. Wis. Dec. 5, 2022) ("the complaint does not contain any allegations concerning the specific services performed by the comparator plans' recordkeepers or any allegations supporting a plausible inference that the plan's recordkeeping services were equivalent to those provided by the comparator plans," leaving the court with "only a naked fee-to-fee comparison," which does not survive dismissal); *O'Driscoll v. Plexus Corp.*, No. 20–1065, 2022 WL 3600824, at *4 (E.D. Wis. Aug. 23, 2022) (dismissal with prejudice for lack of standing where plaintiff never was in the plan under one recordkeeper and never herself paid any allegedly excessive fees under the other); *Lange v. Infinity Healthcare Physicians, S.C.*, No. 20–737, 2021 WL 3022117, at *2 (W.D. Wis. July 16, 2021) (granting dismissal of recordkeeping fee claims pursuant to Rule 12(b)(1) for lack of standing where plaintiff herself via her account did not pay any recordkeeping fees to the recordkeeper); *Gonzalez v. Northwell Health, Inc.*, No. 20–3256, --- F.Supp.3d ----, 2022 WL 4639673, at *10 (E.D.N.Y. Sept. 30, 2022) ("A plaintiff 'must plead administrative fees that are excessive in relation to the *specific* services the recordkeeper provided to the *specific* plan at issue.'") (emphases in original); *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022) ("Smith fails to give the kind of context that could move this claim from possibility to plausibility. She has not pleaded that the services that CommonSpirit's fee covers are equivalent to those provided by the plans comprising the average in the industry publication that she cites . . . Smith has failed 'to allege that the fees were excessive relative to the services rendered. [She] also allege[s] no facts concerning other factors relevant to determining whether a fee is excessive under the circumstances.'"); *Fritton v. Taylor Corp.*, No. 22–415, 2022 WL 17584416, at *8 (D. Minn. Dec. 12, 2022) (the factual assertion that "there is nothing to suggest that" Defendants engaged in an RFP process seems to be another way of speculating this did not happen, and that is insufficient under Rule 12(b)(6)"); *Singh v. Deloitte LLP*, No. 21–8458, 2023 WL 186679, at *5 (S.D.N.Y. Jan. 13, 2023) ("[T]he plaintiffs still do not allege, with specificity, what recordkeeping services the 401(k) Plan received from Vanguard. Even further, they have not alleged what recordkeeping services the comparator plans received from Vanguard. The plaintiffs' allegation that all recordkeepers offer the same range of services does not mean that all plans employing a particular recordkeeper receive an identical subset of services within that range. And "paying higher-fees alone does not allow the Court to conclude that the fees were excessive enough to prove [the defendants'] imprudence.").

dismissed ERISA recordkeeper fee cases; and because it suffers from fatal flaws that cannot be resuscitated, the Complaint should be dismissed with prejudice.

## BACKGROUND AND ALLEGATIONS OF THE COMPLAINT

Defendant Sparrow Health System ("Sparrow" or "SHS") is a community-owned, community-governed health system based in Lansing, Michigan, with hospitals in Lansing and in rural communities including Carson City, Charlotte, Ionia and St. Johns, and with more than 115 sites across Mid-Michigan. (ECF No. 1 at PageID.7, ¶26). Sparrow has more than 526 providers and specialists, and is one of Mid-Michigan's largest private employers. (*Id.*).[4]

Sparrow voluntarily established and maintains a 401(k) plan known as the Sparrow Health System Associate Retirement Savings Plan (the "Plan") to enable Sparrow voluntarily to provide retirement income benefits to eligible employees and to provide such employees with an opportunity to accumulate retirement savings on a tax-deferred basis, as provided in the Plan.[5]

---

[4] *See generally*, https://www.sparrow.org/; https://www.sparrow.org/our-hospitals-services (last visited January 26, 2023).

[5] Effective August 1, 2007, SHS established the Plan and Trust Agreement. The Plan covers a substantial number of employees (caregivers) of the following entities: Sparrow Health System; Edward W. Sparrow Hospital Association; Sparrow Community Care (formerly Sparrow Home Care, Inc.); Sparrow Development, Inc. (through December 17, 2011); Sparrow Regional Medical Supply and Pharmacy, LLC (through June 30, 2011); Mid-Michigan MRI, Inc.; Physicians Health Plan (formerly Physicians Health Plan of Mid-Michigan); PHP Shared Services, LLC (formerly Physicians Health Plans Shared Services, LLC); Sparrow Specialty Hospital (effective January 1, 2008); Sparrow Clinton Hospital (effective January 1, 2009); and Sparrow Ionia Hospital (effective December 18, 2010) (collectively referred to as Adopting Employers).
Effective January 1, 2012, employees of the Michigan Nurses Association (MNA) that were formerly members of the Sparrow Health System Associate Pension Plan and elected during the 2011 MNA Choice Campaign to earn post-2011 retirement benefit accruals under the Plan are permitted to participate in the Plan. Effective January 1, 2016, Sparrow Carson Hospital became an Adopting Employer. Effective January 1, 2020, Sparrow Eaton Hospital (formerly Hayes Green Beach Memorial Hospital) became an Adopting Employer. In 2020, the participant accounts and assets (totaling $19,145,365) of the former Hayes Green Beach Memorial Hospital 401(k) Employee Retirement Plan were transferred into the Plan. Certain vesting and eligibility criteria apply to Sparrow Eaton Hospital caregivers, as defined in the plan amendment. Prior to the merger, the Hayes Green Beach Memorial Hospital 401(k) Employee Retirement Plan experienced late contributions which were corrected by the Plan in 2020. The Plan was amended on January 1,

*See also* ECF No. 1 at PageID.3, ¶5. Transamerica Retirement Solutions, LLC ("TRS" or "Transamerica"), which is also formerly known as Transamerica Retirement Solutions Corporation, Diversified Retirement Corporation, Diversified Investment Advisors, and/or Diversified Pension Advisors, Inc., is and has been recordkeeper for the Plan or one or more of its prior iterations, since 2007 under one or more services agreements, as amended (the "Services Agreement").

Plaintiff claims she is a Michigan resident and was or is an employee of Sparrow. (ECF No. 1 at PageID.6, ¶¶ 19-20). Plaintiff alleges Sparrow hired Plaintiff as a pharmacy technician and she served at different locations from December 23, 2000 until May of 2014. Plaintiff alleges in April 2017, she began working at Hayes Green Beach Memorial Hospital in Charlotte, Michigan, as an Inpatient Pharmacy Technician. (*Id.*). Hayes Green Beach was merged into Sparrow Eaton Hospital in 2019, and Plaintiff was an employee of Sparrow at the time this action was filed. (*Id.*).

Plaintiff contends that during the alleged "Class Period," as that term is defined in the Complaint, she was a participant in the Plan and held investments in the following three investment funds: T. Rowe Price Retirement 2040 target date fund, Dodge & Cox Stock Fund, and Harbor Capital Appreciation Fund. (ECF No. 1 at PageID.6, ¶¶19, 21).

Although Plaintiff pleads no facts on this front, Plaintiff broadly opines that all recordkeepers such as Transamerica provide "services through standard bundled offerings of the

---

2021, becoming a multiple employer Plan, as Physicians Health Plan ceased to be in the same controlled group. The Plan was then amended and restated effective as of July 1, 2022. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"). *See generally* 2021 Form 5500 for the Plan, at p. 41 of 52 (Notes to Financial Statements, Dec. 31, 2021), ¶ 1 ("Description of Plan"), available at https://www.efast.dol.gov/5500search/ (last visited January 26, 2023). The Plan has grown substantially over time with the addition of hospitals and participants, and with market growth.

materially identical level" and that "there are no material difference [*sic*] between the services that are offered and provided by national recordkeepers." (ECF No. 1 at PageID.10, 13, ¶¶38, 47).[6] And even if the same services were <u>available</u>, Plaintiff does nothing to allege what services were <u>in fact provided</u> to the various plans to which Plaintiff seeks to compare this Plan.

Plaintiff alleges the Plan paid an effective average annual recordkeeping fee of $81 per participant. (ECF No. 1 at PageID.28, ¶101). Plaintiff further alleges that a hypothetical prudent plan fiduciary would have paid on average an effective annual recordkeeping fee of around $35 per participant, if not lower (based on Plaintiff's alleged comparative plans). (ECF No. 1 at PageID.24, 28, ¶¶88, 102). As a result of the difference between these two figures, without taking into account any specific (what Plaintiff calls) "RKA" service offerings that were in fact provided, Plaintiff concludes, opines or infers that the Plan charged on average approximately $46 in unnecessary "RKA" fees per participant per year. (ECF No. 1 at PageID.29, ¶105).

Plaintiff claims improperly Sparrow is a "mega plan," lifting that term from an article claiming such a plan has $500M or more in assets. And Plaintiff claims without facts that "the

---

[6] Plaintiff also utilizes an ill-defined but broadly applied (by Plaintiff) term of "RKA" using Plaintiff's opinion and conclusion of how a small, unidentified "group" of vendors provide the same, bundled services to 401(k) plans across the land, suggestion without facts, no differentiation exists but price and size (and the presence or absence of negotiations regarding same). Plaintiff asserts a group exists of national retirement plan services providers commonly and generically referred to as "recordkeepers" that have developed bundled service offerings for plans. (ECF No. 1 at PageID.10, ¶37). These recordkeepers deliver recordkeeping and related administrative ("RKA") services through bundled service offerings. (ECF No. 1 at PageID.10, ¶37). TRS, according to Plaintiff, is one such recordkeeper. (*Id.*). During the entire Class Period, Plaintiff claims the Plan received "RKA" services from Transamerica. (ECF No. 1 at PageID.17, ¶67). Plaintiff alleges that the Plan's "RKA fees" were objectively unreasonable and excessive when compared with the fees paid by other allegedly comparable 401(k) plans that had similar numbers of plan participants. (ECF No. 1 at PageID.17, ¶68). As a result, Plaintiff alleges, the Plan's RKA fees led to lower net returns than the rates enjoyed by participants in allegedly comparable 401(k) plans. (ECF No. 1 at PageID.18, ¶71).

RKA offering" [*sic*] are "materially identical among all recordkeepers who provide services to mega plans." (ECF No. 1 at PageID.13, ¶¶ 25, 49).[7]

Plaintiff further alleges that Defendants could have offered (but did not) the exact same undefined or unidentified "RKA" services at a lower cost by prudently negotiating with Transamerica for lower fees or by using a different recordkeeper. (ECF No. 1 at PageID.29, ¶¶108, 111).

As a result of the foregoing, during the Class Period, Plaintiff opines and alleges that the Defendants:

- Breached their duty of prudence to the Plan, to Plaintiff, and all other Plan participants, by authorizing the Plan to pay objectively unreasonable fees for recordkeeping services. (ECF No. 1 at PageID.18, ¶72).

- Failed to regularly monitor the Plan's alleged "Bundled RKA" fees paid to Transamerica. (ECF No. 1 at PageID.21, ¶85);

- Failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Transamerica, in order to avoid paying unreasonable alleged "Bundled RKA" fees. (ECF No. 1 at PageID.21, ¶86); and

---

[7] "Mega plan" is not a legal term, nor does it have any legal significance. More importantly, Plaintiff's own chart reveals that, far from being a "mega plan" under Plaintiff's definition, the Plan was actually nearly 20% less than $500M. *See* ECF No. 1 at PageID.24, ¶ 90 (chart, showing $406M) [the Paragraph mislabeled by Plaintiff as ¶ 98, likely due to cutting and pasting from another complaint]. Indeed, numerous other problems exist with this arbitrary and unfitting category on which Plaintiff improperly tries to steer the analysis, including, but not limited to, the following: (a) **three other plans** among the 11 alleged comparators on the chart (27.2%) (Children's Medical, Vibra and Sutter) **are also not "mega plans"** under Plaintiff's definition; (b) one of those is a 403(b) plan; (c) **three others** (another 27.2%) (Flowserve, Boston Consulting and Bausch) are **more than double** the size of the Sparrow Plan; and (d) **two others** (18.1%) (Viacom and Fortive) are each **over $1.2B in size** and **more than triple** the size of the Sparrow Plan – all according to the chart Plaintiff herself (via counsel) created and on which she relies.

- Followed a fiduciary process that was ineffective given the objectively unreasonable "RKA" fees it paid to Transamerica and in light of the level and quality of recordkeeper services it received. (ECF No. 1 at PageID.22, ¶87).

Plaintiff alleges all of these conclusions with no alleged facts concerning the particulars of Defendants' actual process for administering the Plan. Rather, Plaintiff alleges: "Based on fees paid by other large plans during the Class Period receiving materially identical RKA services, it is clear and more than reasonable **to infer** that Defendants failed to follow a prudent process to ensure that the Plan was paying only reasonable fees." *See* ECF No. 1 at PageID.27, ¶97 (emphasis added). And in Count II (a derivative failure to monitor claim): "The objectively unreasonable and excessive RKA fees paid by the Plan to Transamerica **inferentially suggest** . . ." *See* ECF No. 1 at PageID.38, ¶149 (emphasis added). Plaintiff presents at best mere opinions and baseless suggestions.

### A. Plaintiff Incurred No Net Fees To TRS.

The Services Agreement with TRS goes back to August 1, 2007, and has had 20 amendments, and is attached in full hereto as Exhibit A (main document plus all 20 amendments) (collectively the "SA").

In providing its services, TRS obtains an agreed amount of "required revenue" calculated by basis points applied to plan assets, but with a variety of revenue sharing credits and other reductions in expenses to the Plan. *See*, *e.g.*, Exhibit A, SA Amendment 15 (effective September 1, 2017) (23bps) (0.23%). Plaintiff entered the Plan at this time (Q4 2017), which is evident from her account statements, which are attached hereto as Exhibit B. Pursuant to the Plan and the SA, Sparrow and/or TRS credited significant fees and expenses back to Plan participants in the form of Plan Service Credits, for the benefit of the participants' investment returns and retirement

income, which is evident on Plaintiff's quarterly account statements. *See*, *e.g.*, Exhibit A, Amendment 15, at 3 & Amendment 19, at 3–4. *See also* Exhibit B.

Both the fees and credits are regularly applied to participant accounts, so participants' statements reflect both fees and credits each quarter on a fund-by-fund basis. Participants invested in various funds that offer revenue (sharing) to TRS experience revenue credited and reflected as a Plan Service Credit to their account for each such fund that generates such revenue sharing. *See id.* On a participant's statements, the monthly portion of the annual required revenue to TRS is reflected as an "Administrative Fee - Pro-Rata" deducted from Plan participant accounts. *See* Exhibit B (throughout). For Plaintiff, with the TRS revenue sharing credits applied against administrative fees, this all amounted to a total of ZERO in fees, as the revenue sharing credits to Plaintiff completely wiped out any fees she would have incurred, as summarized below:

| Period | Balance | Total Admin Fees | Total Credits | Total Net Fees/Credits[8] |
|--------|---------|------------------|---------------|---------------------------|
| Q4 2017 | $457.24 | $ -.24 | $ .29 | $ .05 |
| Q1 2018 | $458.99 | $ -.26 | $ 1.03 | $ .77 |
| Q2 2018 | $472.52 | $ -.26 | $ .32 | $ .06 |
| Q3 2018 | $495.32 | $ -.25 | $ .31 | $ .06 |
| Q4 2018 | $433.84 | $ -.16 | $ .31 | $ .15 |
| Q1 2019 | $485.43 | $ -.12 | $ .29 | $ .17 |
| Q2 2019 | $499.99 | $ -.14 | $ .25 | $ .11 |
| Q3 2019 | $499.02 | $ -.15 | $ .24 | $ .09 |
| Q4 2019 | $542.19 | $ -.13 | $ .38 | $ .25 |
| Q1 2020 | $3,853.10 | $ -1.56 | $ 1.52 | -$ .04 |
| Q2 2020 | $5,332.22 | $ -1.90 | $ 1.79 | -$ .11 |
| Q3 2020 | $7,402.47 | $ -2.60 | $ 2.35 | -$ .25 |
| Q4 2020 | $9,451.23 | $ -3.10 | $ 3.19 | $ .09 |
| Q1 2021 | $10,821.97 | $ -3.72 | $ 3.80 | $ .08 |
| Q2 2021 | $12,325.62 | $ -4.32 | $ 4.36 | $ .04 |
| Q3 2021 | $13,160.06 | $ -4.85 | $ 4.88 | $ .03 |
| Q4 2021 | $15,649.33 | $ -5.47 | $ 5.47 | $ .00 |
| Q1 2022 | $15,236.53 | $ -5.45 | $ 5.44 | -$ .01 |
| Q2 2022 | $13,241.48 | $ -5.20 | $ 5.22 | $ .02 |
| Q3 2022 | $9,608.49 | $ -4.84 | $ 4.87 | $ .03 |

[8] A positive number signifies a net credit on the account in that amount for the quarter, and a negative number signifies a net fee on the account for that quarter.

| Q4 2022 | $10,395.44 | $-3.47 | $3.77 | $.30 |

The sum of all fees and credits for Plaintiff's Plan account, from Q4 2017 to Q4 2022, is a positive $1.89, meaning that Plaintiff was given total administrative credits on her account that wiped out any administrative charges and instead of charging her account anything, added a net $1.89.

**B. Specific Services Provided By TRS To The Plan**

The services TRS has provided the Plan include at least the following:



**I. Basic Recordkeeping and General Administrative Services**

- Transition from Prior Recordkeeper (including Implementation Schedule)
- Installation and Maintenance of Participant and Plan Level Records
- Assistance in preparation of contributions via electronic file
- Divisional Accounting
- Daily Transaction Processing
- Language Line (140+ languages)
- Benefit Payments
- Calculation of a variety of distribution and payout options
- Transaction Confirmations
- Issuance of 1099R (Diversified as payor)
- Monitoring of 402(g) limits (as applicable, 401(k)/403(b) Plans)
- Contribution Types (Employer, Employer Match, Employee After-Tax (2 types), 401(k) Salary Deferrals, Qualified Matching/Qualified Nonelective, and Rollover)
- Quarterly Statements
  - Mailed to Participant homes
  - Plan Level
- Retirement Counseling
- Investment Education
- Plan Design Assistance
- Plan Administration Manual
- Legislative and compliance guidance
- Assistance in preparation of signature ready Annual 5500 filings*
- Qualified Domestic Relations Order review assistance
- Wide variety of Diversified's investment options to meet 404 (c) requirements
- Assistance in development of Investment Policy Statement
- Manager selection and monitoring (Diversified funds only).
- Periodic Client Seminars

- Periodic Employee Seminars (as reasonably requested for groups of 25 or more)
- Communications
  Employer:
  Development of participant communication strategy
  Investment performance updates
  Technical Newsletters and Updates
  Annual plan and investment review
  Toll-free telephone/Internet access
    Account balance by fund
    History of transactions
    Loan information
    Withdrawal information
    Investment fund allocation
    Investment performance and fund information
    Share prices/unit values
    Plan Sponsor Site report writing
  Participant:
  Personalized Reports (as applicable 401(k)/403(b) Plans)
  Contact Center Hours Available 8-9 PM EST
  Initial and on-going enrollment meetings (as reasonably requested for groups of 25 or more)
  Tailored enrollment materials and personalized reports
  Toll-free line/Internet access
    Account balance
    Share prices/unit values
    Account balance by fund
    Loan balance and hardship withdrawal (amount available)
    Investment allocation changes
    Fund transfers
    Investment fund objectives
    Performance information
    Transaction history
    Loan modeling
    Loan initiation (subject to certain limitations)
* Additional fees may apply for the portion of the reporting period the Employer is not a Diversified client.

*See* Exhibit A (SA, at p. 2. In addition, TRS provides the Plan basic compliance testing (which includes numerous subcategories), additional investment services, "non-standard" compliance testing (with numerous subcategories), and merger and acquisition services. *See id.*, at pp. 3–5.

Sparrow's Form 5500s, Schedule C, for each year during the Class Period indicate that Transamerica, as the Recordkeeper, performed the same services for Sparrow's Plan each year: the services are designated by Service Codes 12, 15, 28, 37, 38, 50, 54, 59, 61, 62, 63, 64, and 65. *See* Forms 5500, Schedule C, Part I, Sec. 2(b) and (c).[9]  For 2021, these codes translate to:

---

[9] Under sections 104 and 4065 of ERISA, 29 U.S.C. §§ 1001, *et seq*., and sections 6057(b) and 6058(a) of the Internal Revenue Code of 1986, employers who maintain a 401(k) Plan are required to prepare and file annually with the Department of Labor an Annual Return/Report of Employee Benefit Plan (Form 5500).  Plaintiff refers to Sparrow's Form 5500 filings for the Plan, and relies on the information reported therein, in numerous places in the Complaint. (ECF No. 1 at PageID.8, 22-24, 26-29, ¶¶31, 88, 95, 97-98, 101-104).  All Form 5500s for this Plan and the various plans cited in the Complaint may be found publicly at https://www.efast.dol.gov/5500search/ (last visited January 26, 2023).

| Code | Service/Compensation |
|------|----------------------|
| 10 | Accounting (including auditing) |
| 11 | Actuarial |
| 12 | Claims processing |
| 13 | Contract Administrator |
| 14 | Plan Administrator |
| 15 | Recordkeeping and information management (computing, tabulating, data processing, etc.) |
| 16 | Consulting (general) |
| 17 | Consulting (pension) |
| 18 | Custodial (other than securities) |
| 19 | Custodial (securities) |
| 20 | Trustee (individual) |
| 21 | Trustee (bank, trust company, or similar financial institution) |
| 22 | Insurance agents and brokers |
| 23 | Insurance services |
| 24 | Trustee (discretionary) |
| 25 | Trustee (directed) |
| 26 | Investment advisory (participants) |
| 27 | Investment advisory (plan) |
| 28 | Investment management |
| 29 | Legal |
| 30 | Employee (plan) |
| 31 | Named fiduciary |
| 32 | Real estate brokerage |
| 33 | Securities brokerage |
| 34 | Valuation (appraisals, etc.) |
| 35 | Employee (plan sponsor) |
| 36 | Copying and duplicating |
| 37 | Participant loan processing |
| 38 | Participant communication |
| 40 | Foreign entity (e.g., an agent or broker, bank, insurance company, etc. not operating within jurisdictional boundaries of the United States) |
| 49 | Other services |
| 50 | Direct payment from the plan |
| 51 | Investment management fees paid directly by plan |
| 52 | Investment management fees paid indirectly by plan |
| 53 | Insurance brokerage commissions and fees |
| 54 | Sales loads (front end and deferred) |
| 55 | Other commissions |
| 56 | Non-monetary compensation |
| 57 | Redemption fees |
| 58 | Product termination fees (surrender charges, etc.) |
| 59 | Shareholder servicing fees |
| 60 | Sub-transfer agency fees |
| 61 | Finders' fees/placement fees |
| 62 | Float revenue |
| 63 | Distribution (12b-1) fees |
| 64 | Recordkeeping fees |
| 65 | Account maintenance fees |
| 66 | Insurance mortality and expense charge |
| 67 | Other insurance wrap fees |
| 68 | "Soft dollars' commissions" |
| 70 | Consulting fees |
| 71 | Securities brokerage commissions and fees |
| 72 | Other investment fees and expenses |
| 73 | Other insurance fees and expenses |
| 99 | Other fees |

*See* 2021 Instructions for Form 5500, at p. 29 of 84.[10]

---

[10] *Available at* https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2021-instructions.pdf (last visited January 26, 2023). Prior years' Instructions have the same or similar codes. *See*, *e.g.*, 2020, *available at* https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2020-instructions.pdf (last visited January 26, 2023); 2019 *available at* https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2019-instructions.pdf (last visited January 26, 2023); 2018, *available at*

### C. The Eleven "Comparators" Report Very Different, And Usually Much Fewer, Services.

The eleven (11) allegedly comparable plans used by Plaintiff to calculate her allegedly average fee of $35 per participant, which forms the basis for her claims, include numerous recordkeepers that disclosed for 2018 (the year Plaintiff uses for her alleged comparator chart) materially different services based on the service codes reported in each plan's Form 5500, Schedule C.

| Plan Name | Service Codes – 2018 Form 5500, Schedule C | Page of Form 5500 |
|---|---|---|
| | | |
| Sparrow | 12, 15, 28, 37, 38, 50, 54, 59, 61, 62, 63, 64, 65 | Page 6 of 50 |
| | | |
| Flowserve Corporation Retirement Savings | 15, 21, 25, 28, 33, 37, 38, 49, 50, 52, 55, 59, 62, 64, 65, 71 | Page 6 of 40 |
| The Boston Consulting Group | 15, 25, 37, 52 | Page 6 of 40 |
| Bausch Health Companies Inc. | 37, 60, 64, 65 | Page 6 of 47 |
| Children's Medical Center of Dallas Employee Savings Plan | 37, 38, 50, 60, 64, 65 | Page 14 of 48 |
| Ralph Lauren Corporation 401(K) | 15, 21, 25, 28, 33, 37, 38, 49, 50, 52, 55, 57, 59, 62, 64, 65 | Page 6 of 39 |
| Vibra Healthcare Retirement Plan | 15, 37, 50, 64 | Page 10 of 43 |
| Republic National 401(K) Plan | 15, 37, 50, 64 | Page 6 of 37 |
| Southern California Permanente Medical Group Tax Savings | 15, 25, 26, 37, 38, 52 | Page 6 of 36 |
| Viacom 401(K) Plan | 15, 37, 50, 64 | Page 6 of 50 |
| Sutter Health Retirement Income Plan | 60, 64, 65 | Page 6 of 36 |
| Fortive Retirement Savings Plan | 37, 64, 65, 71 | Page 6 of 37 |

https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2018-instructions.pdf (last visited January 26, 2023); 2017, *available at* https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2017-instructions.pdf (last visited January 26, 2023); 2016, *available at* https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2016-instructions.pdf (last visited January 26, 2023).

Rather than comparing apples-to-apples, Plaintiff is often comparing plans using the compared recordkeepers for a mere third or quarter of the number of services, and a vast array of different types of services and different arrangements, as is all readily apparent from these publicly available documents.

## ARGUMENT

### A. The Legal Standards

The Sixth Circuit has held that the standing doctrine, specifically the constitutional requirement for a case or controversy, is a jurisdictional limitation on federal courts. *See Kiser v. Reitz*, 765 F.3d 601, 606 (6th Cir. 2014); *e.g., Hyman v. City of Louisville*, 53 F. App'x 740, 743 (6th Cir. 2002) ("Standing, a jurisdictional element drawn from Article III constitutional requirements as well as prudential considerations, is not waivable by the parties and must be present in every case."). The Sixth Circuit has also held that standing, as a challenge to the court's subject-matter jurisdiction, is properly raised through a motion under Rule 12(b)(1). *Lyshe v. Levy*, 854 F.3d 855, 857–58 (6th Cir. 2017). "'The party invoking federal jurisdiction bears the burden of establishing' standing" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S.Ct. 1138, 1148 (2013)). When considering a motion to dismiss for lack of standing, federal courts must accept as true all material allegations in the complaint. *Parsons v. United States Dep't of Justice*, 801 F.3d 701, 710 (6th Cir. 2015) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

The injury-in-fact requirement ensures that the plaintiff has a "personal stake in the outcome of the controversy." *Warth*, at 498 (internal quotation marks omitted). Importantly for this case, an injury sufficient to satisfy Article III must be "concrete and particularized" and

"actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992) (some internal question marks omitted).

A motion to dismiss under Rule 12(b)(1) may challenge the sufficiency of the pleadings (a facial challenge) or the factual existence of subject-matter jurisdiction (a factual challenge). *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). In a facial challenge, the court considers the sufficiency of the pleadings and accepts as true all the allegations in the complaint, similar to the standard for a Rule 12(b)(6) motion. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990); *Cartwright*, 751 F.3d at 759. When the defendant challenges subject-matter jurisdiction through a facial attack, the court considers only the factual allegations in the complaint. *See Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (6th Cir. 2003); *accord Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) ("In a facial attack, 'the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6) safeguards.' ") (citation omitted); *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) ("In reviewing a facial attack, the court must consider only the allegations of the complaint and documents reference therein and attached thereto, in the light most favorable to the plaintiff.").

A defendant bringing a motion to dismiss for failure to state a claim under Rule 12(b)(6) tests whether a cognizable claim has been pled in the complaint. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988). To survive the motion, a plaintiff must allege facts sufficient to state a claim for relief that is "plausible on its face" and, when accepted as true, are sufficient to "raise a right to relief above the speculative level." *Mills v. Barnard*, 869 F.3d 473, 479 (6th Cir. 2017) (citation omitted). "The complaint must 'contain either direct or inferential allegations respecting all material elements necessary for recovery under a viable legal theory.'"

*Kreipke v. Wayne State Univ.*, 807 F.3d 768, 774 (6th Cir. 2015) (citation omitted). "A claim is plausible on its face if the 'plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

"In putative ERISA class actions, Rule 12(b)(6) motions are an 'important mechanism for weeding out meritless claims.'" *Albert v. Oshkosh Corp.*, 47 F.4th 570, 577 (7th Cir. 2022) (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)). "Courts apply a 'careful, context-sensitive scrutiny of a complaint's allegations' to 'divide the plausible sheep from the meritless goats.'" *Id.* "At times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Northwestern Univ.*, 211 L. Ed. 2d 558, 142 S. Ct. 737, 742 (2022); *Oshkosh*, 47 F.4th at 577. If the plaintiff does not "nudge[ ] [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

When considering a motion to dismiss, a court must accept as true all factual allegations, but need not accept any legal conclusions. *Ctr. for Bio–Ethical Reform*, 648 F.3d at 369. The Sixth Circuit has noted that courts "may no longer accept conclusory legal allegations that do not include specific facts necessary to establish the cause of action." *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1050 (6th Cir. 2011).

On a motion to dismiss ERISA claims, the Court may "consider the plan documents along with the complaint, because they were incorporated through reference to the plaintiff's rights under the plans, and they are central to plaintiff's claims." *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th

Cir. 1997). *See also Bassett v. NCAA,* 528 F.3d 426, 430 (6th Cir. 2008). A court may also

consider public records. *Bassett*, 528 F.3d at 430; *New Eng. Health Care Emps. Pension Fund v.*

*Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003) (citations omitted). *See also Burch v.*

*Whirlpool* Corp., No. 17–18, 2017 WL 7370988, at *2 (W.D. Mich. Sept. 28, 2017) (Maloney, J.).

"[A] defendant may introduce certain pertinent documents if the plaintiff fails to do so." *Weiner*,

108 F.3d at 89. A court "may consider the full text of [] SEC filings, prospectus, analysts' reports

and statements 'integral to the complaint,' even if not attached, without converting the motion into

one for summary judgment." *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360–61 (6th Cir.

2001), quoting *I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2nd Cir. 1991).

"In addition to the allegations in the complaint, the court may also consider other materials that are

integral to the complaint . . ." *Ley v. Visteon Corp.*, 543 F.3d 801, 805 (6th Cir. 2008) (citation

omitted), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48–50

(2011).

**B.     Plaintiff Lacks Article III Standing.**

To having standing to sue in federal court, a plaintiff must demonstrate (1) he or she has

suffered an injury in fact, (2) a causal connection between the injury and the defendant's conduct,

and (3) it is likely, not merely speculative, that the injury will be redressed by a favorable decision.

*Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555,

560-61 (1992)). These three elements have been called the "irreducible constitutional minimum"

for standing, and Plaintiff here, as the party invoking federal jurisdiction, bears the burden of

establishing all three elements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, (2016) (quoting *Lujan*,

504 U.S. at 560). ERISA plaintiffs "are not absolved of their individual obligation to satisfy the

injury element of Article III just because they allege class claims . . . potential class representatives

must demonstrate 'individual standing vis-a-vis the defendant; [they] cannot acquire such standing merely by virtue of bringing a class action.'" *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 582 (6th Cir. 2016) (citations omitted). And the Supreme Court has unequivocally held that § 1132(a)(2) "does not affect the Article III standing analysis." *Thole v. U.S. Bank, N.A.*, 140 S. Ct. 1615, 1620 (2020). Plaintiff does not have Article III standing to assert her claims.

Indeed, as shown above, with the application of credits to Plaintiff's account over time, no recordkeeper fees of which she complains reduced her account balance. In fact, the credits resulted in a net gain in her account. Plaintiff very simply has incurred no net recordkeeper fees, and has suffered no injury-in-fact. This is exactly the sort of deficiency that has resulted in dismissal of putative ERISA class actions over allegedly high recordkeeper fees that allegedly breached duties under ERISA. *See O'Driscoll v. Plexus Corp.*, No. 20–1065, 2022 WL 3600824, at *4 (E.D. Wis. Aug. 23, 2022) (dismissal with prejudice for lack of standing where plaintiff never was in the plan under one recordkeeper and never herself paid any allegedly excessive fees under the other); *Lange v. Infinity Healthcare Physicians, S.C.*, No. 20–737, 2021 WL 3022117, at *2 (W.D. Wis. July 16, 2021) (granting dismissal of recordkeeping fee claims pursuant to Rule 12(b)(1) for lack of standing where plaintiff herself via her account did not pay any recordkeeping fees to the recordkeeper). This Court lacks jurisdiction under Article III, and the Complaint must be dismissed.

**C.    Plaintiff Fails To State A Claim For Breach of Duty of Prudence Based On Alleged Recordkeeper Fees (Count I).**

**1.    Plaintiff Lacks Specific Facts To Support Her Pricing Comparisons.**

The Sixth Circuit has held that a plaintiff must plead facts plausibly showing that the plan's recordkeeping fees were excessive relative to the services rendered, which Plaintiff has not done. Specifically, the Sixth Circuit has rejected recordkeeping allegations like Plaintiff's that are based

on alleged comparable plans. *See Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022). There the Sixth Circuit held that a plaintiff must do more than allege that a plan could have paid lower recordkeeping fees, or that certain other plans (or the average of certain selected "comparable" plans) paid less. In short, the allegation that eleven plans out of potentially hundreds or thousands in the United States paid less than Sparrow, without any facts comparing the specific services offered by those "comparable" plans, does not state a claim that Sparrow acted imprudently or otherwise violated its duties owned to Plan participants under ERISA. In *CommonSpirit*, the Sixth Circuit specifically rejected bare assertions of "average" administrative expenses of $35 per participant, explaining that a plaintiff must plead "that the services that [the defendant's] fee covers are equivalent to those provided by" the comparator plans. *CommonSpirit*, 37 F.4th at 1169. ("Smith fails to give the kind of context that could move this claim from possibility to plausibility. She has not pleaded that the services that CommonSpirit's fee covers are equivalent to those provided by the plans comprising the average in the industry publication that she cites . . . Smith has failed 'to allege that the fees were excessive relative to the services rendered. [She] also allege[s] no facts concerning other factors relevant to determining whether a fee is excessive under the circumstances.'"). Plaintiff falls short of this standard.

Similarly, in *Forman v. TriHealth*, 563 F. Supp. 3d 753 (S.D. Ohio. 2021), the plaintiffs alleged that the plan paid excessive administrative expenses, asserting that, "[f]or every year between 2013 and 2017, the administrative fees charged to Plan participants [were] greater than the fees of more than 90 percent of comparable 401(k) plans." *TriHealth* at 761. The district court rejected this claim, because the plaintiffs "did not describe what services the Plan received in exchange for these administrative fees or what services the 'comparable 401(k) plans' received in exchange for their less costly fees." *Id*. at 761-62. The Sixth Circuit affirmed, concluding that the

plaintiffs "never alleged that these fees were high in relation to the services that the plan provided." 40 F.4th at 449.  Plaintiff's Complaint ignores these principles.

In line with *CommonSpirit* and *TriHealth*, numerous other courts have held that "a plaintiff must plead administrative fees that are excessive in relation to the *specific* services the recordkeeper provided to the *specific* plan at issue." *See, e.g., Young v. General Motors Investment Management Group*, 325 F. App'x 31 (2d Cir. 2009), cited in *Wehner v. Genentech, Inc.*, No. 20–06894, 2021 WL 507599, at *5 (N.D. Cal. Feb. 9, 2021); *see also Kong v. Trader Joe's Co.*, No. 20–05790, 2020 WL 5814102, at *5 (C.D. Cal. Sept. 24, 2020) ("Courts regularly dismiss imprudence claims such as these for failing to allege an adequate market comparison."); *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, No. 17–6685, 2019 WL 4466714, at *8 (S.D.N.Y. Sept. 18, 2019) ("Plaintiffs fail to allege that the administrative 'fees were excessive relative to the services rendered.' "); *White v. Chevron Corp.*, No. 16–0793, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016) (noting that a plaintiff must allege "facts from which one could infer that the same services were available for less on the market." (citing *Young*, 325 F. App'x. at 33)); *Johnson v. Providence Health & Servs.*, No. 17–1779, 2018 WL 1427421, at *8 (W.D. Wash. Mar. 22, 2018) ("Plaintiff does not plausibly allege that another recordkeeper would have provided the same services at a lower cost than Fidelity.").

In *Mator v. Wesco Distribution, Inc.*, No. 21–00403, 2022 WL 1046439, at *6–7 (W.D. Pa. Apr. 7, 2022) the court dismissed a recordkeeping claim premised on "a mere price tag to price tag comparison.".  While other recordkeepers "might offer similar services," the court held, the complaint did not "address the types or levels of services that any plan contracted to receive." *Id*. at *6.  In *Seidner v. Kimberly-Clark Corp.*, 21–867, 2022 WL 865890, at *2 (N.D. Tex. Mar. 23, 2022), the court held that a similar recordkeeping claim was "not sufficiently pleaded for purposes

of Rule 12(b)(6)." And in *Tobias v. NVIDIA Corp.*, 20–06081, 2021 WL 4148706, at *15 (N.D. Cal. Sept. 13, 2021), the court dismissed the recordkeeping claim because the plaintiffs "fail[ed] to provide any allegations regarding the specific services actually provided to the Plan" and "only provide[d] general statistics regarding the fees paid by plans of similar sizes." Even more recently, in *Riley v. Olin Corp.*, 21–01328, 2022 WL 2208953, at *4 (E.D. MS, June 21, 2022), the district court held that, to "plead a meaningful benchmark" for a recordkeeping claim, "the plaintiff must plead that the administrative fees are excessive in relation to the specific services the recordkeeper provided to the specific plan at issue." *Id.* There, the plaintiff pointed to a survey of plans—not just a handful of cherry-picked, alleged comparatives—but the court still found this survey insufficient because it "lacks in detail" and "does not contain any information about the services provided to the surveyed plans." *Id.* As the court explained, a district court "need not accept as true" the legal conclusion that a particular set of data points "serves as a meaningful benchmark against which to weigh the investment committee's actions." *Id.* These and several more recent cases all give the Court ample reasons to find Plaintiff's Complaint suffers from infirmities that are fatal.

Indeed, the cases dismissing these claims that make merely general allegations of similarity are mounting. *See Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 280 (8th Cir. 2022) (affirming dismissal with prejudice, where plaintiffs pointed to the alleged "cost of the typical 'suite of administrative services,' not anything more" and lacked specifics of services and fees matched up with the challenged recordkeeper's total compensation); *Albert v. Oshkosh Corp.*, 47 F.4th 570, 577 (7th Cir. 2022) (citing and relying on *CommonSpirit*, affirming dismissal where plaintiff presented nine alleged comparator plans with allegedly "similar numbers of participants (between around 10,000 and 16,000) and total assets (between $355 million and $2.1 billion) as

the Plan" and had an average of $32 to $45 in annual recordkeeping fees per plan participant, as opposed to $87 – but failed to compare the quality or type of recordkeeping services in fact provided); *Morales v. Capital One Fin. Corp.*, No. 21–1454, Dkt. 42 (Order) (E.D. Va. May 27, 2022) (dismissing excessive RPS fee claims); *Matney v. Barrick Gold of N. Am., Inc.*, No. 20–275, 2022 WL 1186532, at *7, *12 (D. Utah Apr. 21, 2022), *appeal filed*, No. 22–4045 (10th Cir. May 20, 2022) (dismissing excessive RPS fee and share-class claims); *Perkins v. United Surgical Partners Int'l Inc.*, No. 21–973, 2022 WL 824839, at *6 (N.D. Tex. Mar. 18, 2022) (dismissing claims for excessive RPS fees); *Nohara v. Prevea Clinic Inc.*, No. 20–1079, 2022 WL 16927810, at *5 (E.D. Wis. Oct. 27, 2022), *report and recommendation adopted*, 2022 WL 16924483 (E.D. Wis. Nov. 14, 2022); *Glick v. ThedaCare, Inc.*, No. 20–1236, 2022 WL 16927749, at *7 (E.D. Wis. Oct. 27, 2022), *report and recommendation adopted*, 2022 WL 16924188 (E.D. Wis. Nov. 14, 2022); *Laabs v. Faith Techs., Inc.*, No. 20–1534, 2022 WL 17418358, at *3 (E.D. Wis. Nov. 9, 2022), *report and recommendation adopted*, 2022 WL 17417583 (E.D. Wis. Dec. 5, 2022) ("the complaint does not contain any allegations concerning the specific services performed by the comparator plans' recordkeepers or any allegations supporting a plausible inference that the plan's recordkeeping services were equivalent to those provided by the comparator plans," leaving the court with "only a naked fee-to-fee comparison," which does not survive dismissal); *Gonzalez v. Northwell Health, Inc.*, No. 20–3256, --- F.Supp.3d ---, 2022 WL 4639673, at *10 (E.D.N.Y. Sept. 30, 2022) ("A plaintiff 'must plead administrative fees that are excessive in relation to the *specific* services the recordkeeper provided to the *specific* plan at issue.'") (emphases in original); *Fritton v. Taylor Corp.*, No. 22–415, 2022 WL 17584416, at *8 (D. Minn. Dec. 12, 2022) (the factual assertion that "there is nothing to suggest that" Defendants engaged in an RFP process seems to be another way of speculating this did not happen, and that is insufficient under Rule 12(b)(6)");

*Singh v. Deloitte LLP*, No. 21–8458, 2023 WL 186679, at *5 (S.D.N.Y. Jan. 13, 2023) ("[T]he plaintiffs still do not allege, with specificity, what recordkeeping services the 401(k) Plan received from Vanguard. Even further, they have not alleged what recordkeeping services the comparator plans received from Vanguard. The plaintiffs' allegation that all recordkeepers offer the same range of services does not mean that all plans employing a particular recordkeeper receive an identical subset of services within that range. And "paying higher-fees alone does not allow the Court to conclude that the fees were excessive enough to prove [the defendants'] imprudence."). Plaintiff's Complaint fails for these same reasons.

In short, a plaintiff cannot demonstrate imprudence just by purporting to find a handful of plans whose fiduciaries made different choices for different things in different circumstances. *See Barchock v. CVS Health Corp.*, 886 F.3d 43, 52-53 (1st Cir. 2018) ("survey statistics" that purport to show that a defendant charted a different course than most other fiduciaries do not "support a plausible claim that such decision-making was imprudent"). Quite simply, imprudence cannot be reasonably inferred from Plaintiff's apples-to-oranges comparisons.

### 2. The Presented Plans Vary Widely In Range And Are Not Demonstrably Comparable Or Representative Of One Another.

In addition to the material differences in service codes, discussed above, most of Plaintiff's "comparative" plans in the Complaint's table, using data from 2018, are materially dissimilar in terms of number of participants (ranging from 6,395 to 13,502) and plan size in terms of assets (ranging from $107,652,510 to $1,297,404,611). (ECF No. 1 at PageID.24, Compl. ¶88 [sic]). Additionally, Plaintiff's chart, despite utilizing 11 allegedly "comparable" plans to justify its conclusions, only includes four other recordkeepers (T. Rowe Price, Vanguard, Fidelity, and Great-West). (*Id.*). The chart further undermines Plaintiff's administrative expense allegations since the fees reported for the 11 allegedly "comparable" plans are not consistent: the chart reports

that the eleven other plans paid varying amounts in administrative expenses in 2018, ranging from $28 to $42 per participant. (*Id.*). And aside from Plaintiff casually dismissing the relevance of service codes and service offering differences as "immaterial," she makes no effort to explain why the eleven "comparable" plans she has utilized as the bedrock of her claims are plausibly representative of the hundreds of thousands of other plans in the 401(k) market.[11]

### 3. Plaintiff Does Not Show Her Alleged Math.

Plaintiff's formulae and math also are unclear, especially for years (such as prior to 2018 for which the Plan had indirect compensation paid to TRS, and for the allegedly comparable eleven plans that had any indirect compensation paid to their recordkeepers. Plaintiff simply does not show her math. Courts routinely reject conclusory assertions of "comparable" plan costs where a plaintiff guesses at administrative expenses based on their (mis)reading of a Form 5500. In *Cunningham v. USI Insurance Services, LLC*, 2022 WL 889164, at *5 (S.D.N.Y. Mar. 25, 2022), for example, the court granted a motion to dismiss where, as here, the plaintiff "fail[ed] to specify how she calculated the Plan's indirect fees because they are not available by themselves on the Form 5500 filings" and the plaintiff did not "provide any figures, estimates, or formulas from which the Court could reasonably infer Plaintiff obtained such results." Likewise, in *CommonSpirit*, the district court dismissed the recordkeeping claim where the Form 5500 supposedly indicated the payment of indirect compensation, but the complaint did not provide the details to assess the "total recordkeeping fees and how that amount stacks up against" other plans' costs. 2021 WL 4097052, at *11 (E.D. Ky. Sept. 8, 2021). And in *White v. Chevron Corp.*, 16–0793, 2017 WL 2352137, at *18 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453 (9th Cir. 2018), the court rejected comparisons that lumped together different fees, where, as here, the

---

[11] And as noted above, several of the plans, including Sparrow's, fail even to qualify as "mega," which Plaintiff treats as a critical comparative label.

plaintiffs "d[id] not know what portion of the total fees actually relate to recordkeeping." *See also Marks v. Trader Joe's*, No. 19–10942, 2020 WL 2504333, at *6 (C.D. Cal. Apr. 24, 2020) (dismissing fee claim because plaintiffs alleged, without factual support, that the recordkeeper was receiving "indirect compensation" in addition to flat per-participant fees); *White*, 2017 WL 2352137, at *16 (dismissing fee claims where, *inter alia*, plaintiffs alleged that the plan paid administrative and recordkeeping fees in the form of "internal revenue sharing," but judicially noticeable documents did not reflect any such payments).

With respect to indirect costs or revenue sharing, nowhere in the Complaint does Plaintiff provide any figures, reasonable estimates, or reliable formulas from which the Defendants or the Court can reasonably infer Plaintiff actually paid excessive "indirect" fees. At best, Plaintiff suggests that the Court and Defendants may simply "infer" that Plaintiff paid excessive indirect fees or revenue sharing based on her generic allegations about how mega-plans generally work. (ECF No. 1 at PageID.4, 27, Compl. ¶¶12, 97). But a failure to specify how she calculated the Plan's *indirect* fees because they are not available by themselves on the Form 5500 filings is not sufficient to survive a motion to dismiss.

### 4. The Pleading Standard Is Not Lowered For Plaintiff.

Plaintiff's suggestion in her Complaint (¶¶10–12) that she is relieved from the pleading requirements of *Iqbal*/*Twombly* because of claimed inability to know the details about the Plan's operations or specific service levels sufficient to formulate actual comparisons in this context, is disingenuous and incorrect and must be rejected.[12]  *See Smith v. CommonSpirit Health*, 37 F.4th 1160, 1168–69 (6th Cir. 2022) ("Smith worries that the imperatives of pleading a process-based

---

[12] Relying solely upon "RKA fees paid" to "inferentially tell" a "plausible story." *See* Complaint, at ¶12 (ECF No. 1 at PageID.4).

defect put her in a deep hole given the difficulty of gaining information about how her plan chose each investment . . . Fair point. But it is Congress, not the courts, that established a cause of action premised on a duty of prudence, and at all events the difficulties are not insurmountable. ERISA's extensive disclosure requirements ease the burdens. Under the statute, a retirement plan must disclose a range of information about costs and performance, including the administrative expenses it charges to participants . . .").  Indeed, Plaintiff had available the Forms 5500 with all the service codes.  Moreover, Plaintiff had access to the Services Agreement, but failed to ask for it.  *See Mator v. Wesco Distribution, Inc.*, No. 21–00403, 2022 WL 1046439, at *7 (W.D. Pa. Apr. 7, 2022) (granting motion to dismiss where plaintiffs "maintained that they are not required to plead more at this stage with regard to the scope and breadth of services in part because that they do not have the recordkeeping agreement between the Plan and Wells Fargo. However, ERISA (29 U.S.C. § 1024(b)(4)) requires Defendants to provide said agreement upon a participant's written request. Despite this access, neither Plaintiffs nor their counsel have endeavored to obtain the recordkeeping agreement and include any relevant factual allegations regarding the same."). Plaintiff's attempt to lower the pleading standard must fail.

**D.** **Plaintiff Fails To State A Derivative Monitoring Claim (Count II).**

Count II alleging failure to monitor other fiduciaries should be dismissed, because of the complete lack of any plausible specifics, including what would have occurred differently had which fiduciaries known or acted upon what information, when and with respect to whom. Plaintiff argues breach by mere inference and dependent upon the success of Count I.  *See* ECF No. 1 at PageID.38, at ¶ 149.  Indeed, Plaintiff's monitoring claim is fully dependent on the validity of her breach of fiduciary duty of prudence claim (Count I).  Because Plaintiff has not adequately alleged a claim for breach of the duty of prudence, the Court should dismiss her derivative

monitoring claim. *See In re Huntington Bancshares Inc. Erisa Litig.*, 620 F. Supp. 2d 842, 856 (S.D. Ohio 2009) ("because Plaintiffs have not adequately pleaded the existence of any underlying fiduciary breach, these tag-along claims [for failure to monitor, failure to disclose information to co-fiduciaries and co-fiduciary liability] fail as well."); *Matney v. Barrick Gold of N. Am., Inc.*, No. 20–275, 2022 WL 1186532, at *14 (D. Utah Apr. 21, 2022). Count II should be dismissed.

## CONCLUSION

The Motion should be granted, and Plaintiff's Complaint should be dismissed with prejudice.

<div style="margin-left: 40%;">

Respectfully submitted,

s/ Paul A. Wilhelm
Paul A. Wilhelm (P69163)
David W. Centner (P43071)
CLARK HILL PLC
200 Ottawa Ave. NW, Suite 500
Grand Rapids, MI 49503
Ph: 616.608.1126 / 616.608.1106
pwilhelm@clarkhill.com
dcentner@clarkhill.com

</div>

Date: January 27, 2023                    *Attorneys for Defendants*

## <u>CERTIFICATION RE WORD COUNT</u>

I, Paul A. Wilhelm, hereby certify pursuant to LCivR 7.2(b)(ii) that this Brief was prepared using Microsoft Word (from Microsoft Office 365 ProPlus), and that the word count as defined by LCivR 7.2(b)(i) generated by that same word processing software, is 8,224, inclusive of headings, footnotes, citations and quotations, and within the 10,800 word limit imposed by that Rule.

<div style="margin-left: 40%;">

s/Paul A. Wilhelm
Paul A. Wilhelm (P69163)
CLARK HILL PLC
*Attorneys for Defendants*

</div>

270086888.v3